<u>NOT FOR PUBLICATION</u>     [Docket Nos. 95, 106, 108, 123, 128]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

PAUL L. SCHIRMER,

Civil No. 10-1444 RMB/JS

DOUGLAS PENKETHMAN, et al.,          **OPINION**

Appearances:

Justin T. Loughry, Esquire
Lawrence W. Lindsay, Esquire
Loughry & Lindsay, LLC
330 Market Street
Camden, New Jersey 08102

        Attorneys for Plaintiff

Timothy R. Bieg, Esquire
Michael P. Madden, Esquire
Madden & Madden
108 Kings Highway East, Suite 200
Haddonfield, New Jersey 08033-0389

        Attorneys for Defendants Douglas Penkethman and
                Michael Kopakowski

A. Michael Barker, Esquire
Barker, Scott & Gelfand
Linwood Greene
210 New Road, Suite 12
Linwood, New Jersey 08221

Attorney for Defendants Jeffrey DeVico, Clinton Stocker,
        and Douglas Osmundsen

Eric L. Harrison, Esquire
Methfessel & Werbel, PC
3 Ethel Road, Suite 300
Edison, New Jersey 08818-3012

    Attorney for Defendants D. Holt and Lt. Lynne Frame

**BUMB,** United States District Judge:

    In this matter, Plaintiff Paul Schirmer ("Plaintiff") seeks

damages for false arrest and malicious prosecution, based on his

arrest and prosecution on charges that were ultimately

dismissed.  Defendants in the above-captioned matter have filed

three summary judgment motions.  [Docket Nos. 95, 106, 108].

For the reasons that follow, their motions are GRANTED.[1]

I.  <u>Background</u>

    A.   <u>The Parties</u>

    Plaintiff was a teacher at the Middle Township Elementary

School.  Defendant Douglas Penkethman ("Penketham") was the

school's principal.  Defendant Michael Kopakowski ("Kopakowski")

was the school's superintendent.  Defendants Corporal Jeffrey

DeVico ("DeVico"), Detective Clinton Stocker ("Stocker"), and

Detective Douglas Osmundsen ("Osmundsen") were employed by the

Middle Township Police Department.  Defendants Detective D. Holt

2

("Holt") and Lieutenant Lynne Frame ("Frame") were employed by
the Cape May Prosecutor's Office.

     B.   <u>The March 19, 2008 Note</u>

     On the afternoon of March 19, 2008, Penkethman received a
note that appeared to be written by four students - T.R., J.B.,
A.S., and T.P. [Docket No. 95, Statement of Undisputed Material
Facts of Penketham and Kopakowski ("SUMF-PK") ¶¶ 16, 17; Docket
No. 116, Plaintiff's Response to SUMF-PK ("Pl. Resp. SUMF-PK") ¶
17].  The note stated, in relevant part:

> My name is T.P. and my 3 friends have something to say
> about Mr. Shirmer [sic] . . . .  He also puts his arm
> on us and puts us agenst [sic] his side like were
> [sic] his child.  He's touching us in places where we
> don't want to talk about . . . .  He yells at us for
> no reason.  He ignores us when we talk to him.

[SUMF-PK at Ex. C].

     C.   <u>Penketham's Informs The Board Of The Note And
Interviews Its Writers</u>

     Once Penkethman received the note, he contacted
Kopakowski and faxed him a copy of it.  [Docket No. 108,
Statement of Undisputed Material Facts of Defendants
DeVico, Stocker, Osmundsen ("SUMF-DSO") ¶ 39].  That same
day, Penkethman spoke with each of the signatories to the
note, with the exception of A.S., who was absent, in order

---

[1]    Plaintiff and Defendants DeVico, Osmundsen, and Stocker have also made
motions to seal certain items on the Docket.  [Docket Nos. 123, 128].
Those motions are GRANTED.

to confirm that the signatories to the note had actually participated in writing it.  [SUMF-PK, Ex. B, Transcript of Deposition of Douglas Penketham ("Penketham Dep.") at 5:5-9].

T.P. informed Penkethman that he had written the note but that "nothing inappropriate had happened to him directly." [Penketham Dep. at 15:14-19].  T.R. advised Penkethman that he had not been touched inappropriately, but another student, J.H., who was not a signatory of the letter, told him, T.R., that "he had been touched inappropriately by Mr. Schirmer."  [Id. at 19:4-5].  Similarly, J.B. informed Penkethman that another student - S.S.- told J.B. that "while they were in the small group setting, Mr. Schirmer slapped [S.S.] on [S.S.'] butt." [Id. at 20:6-8].

D.   Penketham Interviews J.H. And S.S.

Based on this new information, Penkethman then spoke with J.H. and S.S.  According to Penketham's deposition testimony, J.H. told Penkethman that "when they were on a field trip . . . at the Liberty Bell [in Philadelphia], [Schirmer] slid his hand around in front of [J.H.] and touched [J.H.'s] private area and moved [J.H.] forward."  [Id. at 23:15-24:2].  Penketham's contemporaneous notes similarly report that Schirmer "brushed up against [J.H.'s] private parts" while walking near the Liberty

4

Bell. [See Docket No. 122, Ex. A. to Loughry Certification].
S.S. told Penkethman that, on one occasion, Schirmer "went to
say excuse me and he slapped [S.S.'] butt." [Penketham Dep. at
32:7-15].

   E.   Penketham Updates The Board And Kopakowski And The
        Board Suspends Penketham And Informs The Authorities

   Penkethman then spoke with Kopakowski a second time and
advised him of the interviews and Kopakowski contacted the Board
Solicitor.  [SUMF-PK ¶¶ 28-29].  According to Kopakowski, on the
advice of counsel, the decision was made to: (1) meet with
Schirmer, Penketham, Union President Charlotte Sadler, and
Building Representative Catherine Brown that day and suspend
Schirmer without pay; and (2) inform the police and the
Department of Youth and Family services.  [Id. at ¶¶ 30-32].

   At approximately 4:00 p.m., March 19, 2008, the same day
Penkethman received the note, Schirmer attended a meeting with
Penkethman, Kopakowski, Sadler, and Brown.  [Id. at ¶ 33].
During that meeting, Penkethman advised Schirmer of the note and
the allegations made by J.H. and S.S.  Kopakowski advised
Schirmer that he would be suspended with pay and benefits.
Plaintiff denied the allegations at this meeting.  [Id. at ¶¶
34-38].

   F.   The Investigation

5

At the end of the school day, Kopakowski asked DeVico, who had been present at the school teaching a D.A.R.E. class, to stay longer because they were dealing with a matter that might need police involvement.  [SUMF-DSO at ¶ 66]  DeVico met with Penkethman and Kopakowski, and according to DeVico, Penkethman advised him that he had conducted a preliminary investigation and interviewed students.  [Id. at ¶ 71].  DeVico then spoke with Stocker.  [Id. at ¶¶ 73-77].   Stocker, in turn, contacted the county prosecutor's office.  [Id. at ¶ 77].

Stocker also contacted J.H.'s parents and S.S.'s mother to have the children brought in for interviews.  [Id. at ¶ 80].  Because Stocker was not trained to interview children under the age of thirteen and Osmundsen was, Osmundsen interviewed T.R., J.H., and S.S. later that day at the Cape May County Victim Witness Office.  [Id. at ¶¶ 78-82].  The interviews of the children were able to be watched live through a concealed camera from another room.  [Id. at ¶ 96].

Osmundsen first interviewed S.S. [Id. at ¶¶ 98-99]. Assistant Prosecutor Marian Ragusa was present during S.S.'s interview and listened to it through the closed circuit camera. [SUMF-DSO, Ex. 20, Deposition of Marian Ragusa ("Ragusa Dep.")

6

at 22:10-11].  During the interview, the following exchange took

place:

> DETECTIVE OSMUNDSEN: Okay. Good. Okay. When I
> talk to kids about their body parts, I also like
> to talk to them about touches, okay, touches they
> like and touches they don't like.  Do you get
> touches that you like?  Do you get hugs and
> kisses?
>
> S.S.: Uh-huh.
>
> DETECTIVE OSMUNDSEN: Who gives you hugs and
> kisses?
>
> S.S.:  My mom, my dad, and sometimes my sisters.
>
> DETECTIVE OSMUNDSEN: Really.
>
> S.S.:  Uh-huh.
>
> DETECTIVE OSMUNDSEN: And you like those touches?
>
> S.S.: (Nods head.)
>
> DETECTIVE OSMUNDSEN: Okay.  And does anybody ever
> give you touches that you don't like?
>
> S.S.: (Shakes head.)
>
> DETECTIVE OSMUNDSEN: No?
>
> S.S.: Nobody gave me touches except the person
> that we're here to talk about.
>
> DETECTIVE OSMUNDSEN: Who's the person that we're
> going to talk about?
>
> S.S.: He was my – he's my assistant teacher in
> school, Mr. Schirmer.
>
> DETECTIVE OSMUNDSEN: Okay.

S.S.: And I'm – I'm in his (inaudible) reading group.

DETECTIVE OSMUNDSEN: Okay.

S.S.: And I was sharpening my pencil, and he said, excuse me, and he touched my butt when he went to go past me.

DETECTIVE OSMUNDSEN: Okay.  When did this happen?

S.S.: It happened like a week ago.

DETECTIVE OSMUNDSEN: A week ago, okay.  Did it happen in the classroom, in the hallway, or somewhere's else?

S.S.: In the classroom.  In his classroom.

DETECTIVE OSMUNDSEN: Was it where you go – go to school?

S.S.: Uh-huh.

DETECTIVE OSMUNDSEN: What school is that?  Where do you go to school?

S.S.: Elementary Number 2.

DETECTIVE OSMUNDSEN: Okay.  Do you know the teacher's name?

S.S.: Mr. Schirmer.

DETECTIVE OSMUNDSEN: Mr. Schirmer, okay.  And you said he touched your butt.  Tell me about that.

S.S.: He went behind me instead of going in front of me, because I went to go move up.  I was going to move back, but I moved up instead, and then he just went in the back of me and touched me.

DETECTIVE OSMUNDSEN: Okay.  Did he say anything when he touched you?

8

S.S.: (Shakes head.)

DETECTIVE OSMUNDSEN: No. Did he – where did he touch you on – on this picture?

S.S.: He touched me like right there.

DETECTIVE OSMUNDSEN: Okay.  And do you know if he touched you with his hand, the back of his hand, or something else?

S.S.: He touched me with the – with his palm of his hand.

DETECTIVE OSMUNDSEN: With the palm of his hand. Okay.  And when he touched you, did he just touch you, did he rub you, or something else?

S.S.: He just – well, he touched me, and then he slid his hand and went by.

DETECTIVE OSMUNDSEN: So when you said "slid his hand," I don't understand what you're saying.

S.S.: He like – he like touched, and he slid like that.

DETECTIVE OSMUNDSEN: Across your butt or something else?

S.S.: Yeah, he slid across my butt.

DETECTIVE OSMUNDSEN: Okay.  And what did you say, or what did you do?

S.S.: Well, I just looked at him in a weird way, but he didn't look at me.  And then I just went back to my seat, and then I just got really mad for the rest of the day.

DETECTIVE OSMUNDSEN: Okay.  You said you were sharpening your pencil?

9

S.S.: Yeah.

DETECTIVE OSMUNDSEN: Okay.  What did – where do you sharpen your pencil in the classroom?

S.S.: It's like a – it's the door, and it's like a little desk.  And it has a radio – it has a radio, and then the sharpener is on top of the end of the radio.

DETECTIVE OSMUNDSEN: Okay.  Is there tables, chairs or something else around the pencil sharpener?

S.S.: There's – it's the desk and then a circle table around it.

DETECTIVE OSMUNDSEN: So I guess my question is, is it an open space like this, or is it something really closed?

S.S.: It's like a tight – it's a tight squeezed room.  It's a small room like the size of this room.

DETECTIVE OSMUNDSEN: So if you were sharpening your pencil and I walked by, would I have to rub up against you, or could I walk around you or something –

S.S.: You could have walked around me.

DETECTIVE OSMUNDSEN: I could have walked around you?

S.S.: Uh-huh.

DETECTIVE OSMUNDSEN: So why do you think Mr. Schirmer did this, or don't you know?

S.S.: I don't know.

DETECTIVE OSMUNDSEN: Okay.  All right. Was this –
did this happen once, more than once, or
something – something else?

S.S.: The first time.

DETECTIVE OSMUNDSEN: The first time?

S.S.: Uh-huh.

DETECTIVE OSMUNDSEN: Did it happen any other
time?

S.S.: No.

[Docket No. 108, Ex. 14 at 11:12-17:18].

Osmundsen's second interview was with J.H.  [SUMF-DSO ¶

104].  Ragusa was not present for this interview [Ragusa Dep. At

22:21-23].  During the interview, the following exchange

occurred:

DETECTIVE OSMUNDSEN: . . . Okay.  What about bad
touches?  Does anybody give you bad touches?

J.H.: Mr. Schirmer did.

DETECTIVE OSMUNDSEN: Mr. Schirmer did.  Tell me
about that.

J.H.: I was looking at the Liberty Bell, and he
came up behind me, and he went, no, this way.

DETECTIVE OSMUNDSEN: Okay.  Where is the Liberty
Bell?

J.H.: In Philadelphia.  It was a field trip.

DETECTIVE OSMUNDSEN: It was a field trip?

J.H.: (Nods head.)

11

DETECTIVE OSMUNDSEN: So how did you get there, a
bus, a car, or something else?

J.H.: A bus.

DETECTIVE OSMUNDSEN: A bus.  Did – who went on
the bus?

J.H.: Miss Chabok's class and Miss Brian's class,
I think it was.

DETECTIVE OSMUNDSEN: Miss Chabok's class, your
class and another class?  Miss Brian, you said?

J.H.: I think.

DETECTIVE OSMUNDSEN: When did you go?

J.H.: I think it was in November.

DETECTIVE OSMUNDSEN: November – .

J.H.: I don't remember the day.

DETECTIVE OSMUNDSEN: What grade were you in?

J.H.: Fifth.

DETECTIVE OSMUNDSEN: Fifth grade.  So maybe it
was last – last November, a couple months ago?

J.H.: Yeah.

DETECTIVE OSMUNDSEN: Okay.  Before Christmas,
okay.  What happened when you were at the Liberty
Bell?

J.H.: I was looking at it, and we were moving on,
but I was still looking real quick, and Mr.
Schirmer come up, he said, no, J, this way.

DETECTIVE OSMUNDSEN: Okay. You said, no, this
way.  What – tell me more about that.

J.H.: He – he touched me right here, and he went, no, J this way.

DETECTIVE OSMUNDSEN: Okay.  How did that make you feel?

J.H.: It made me feel weird.

DETECTIVE OSMUNDSEN: Weird?

J.H.: Like he was touching me.

DETECTIVE OSMUNDSEN: Okay.  I don't understand weird.  Can you tell me –

J.H.: Like it made me feel like he was doing something he shouldn't have been doing.

DETECTIVE OSMUNDSEN: It felt like a bad touch, or a good touch, or something else?

J.H.: Bad.  It was bad.

DETECTIVE OSMUNDSEN: Bad.  Did you tell somebody or –

J.H.: Only my two friends.

DETECTIVE OSMUNDSEN: What did you tell T – T?

J.H.: I told him – because they were there, and they were close to me, and they might have saw it, I don't know.  So I said, did you see when Mr. Schirmer went like this to me and said, no, J this way?  And they said, kind of.

DETECTIVE OSMUNDSEN: Okay.  Where did Mr. J (sic) touch you on – on this picture?  Can you point to it?

J.H.: (Indicates.)

DETECTIVE OSMUNDSEN: The wang?

13

J.H.: (Nods head.)

DETECTIVE OSMUNDSEN: Did he – did he touch you, or did he rub across you, or something else?

J.H.: He kind of like went like that and then just kept going, but he had to stop there.  He was like, J this way.

DETECTIVE OSMUNDSEN: Okay.  Was – was he in front of you, behind you, or somewhere's else?

J.H.: He was behind me and reached his arm around.

DETECTIVE OSMUNDSEN: Okay.  And what did he say?

J.H.: He said, no, J, this way, because we were moving on.

DETECTIVE OSMUNDSEN: Okay.  Okay.  What were you wearing?  Do you remember?  Were you wearing jeans, shorts, or something else?

J.H.: I forget.  It was either a casual day or a dress day.  If it was dress, I was probably wearing these kind of pants.

DETECTIVE OSMUNDSEN: Okay.

J.H.: If it was a casual day, I was probably wearing jeans.

DETECTIVE OSMUNDSEN: Okay.  Did you tell any adults, like a teacher, or chaperone, or somebody else?

J.H.: No.

DETECTIVE OSMUNDSEN: No, you just told T and T okay.  And you – this happened in November?

J.H.: (Nods head.)

14

DETECTIVE OSMUNDSEN: Okay.  Did you ever tell your mom or your dad?

J.H.: No.

DETECTIVE OSMUNDSEN: No, why not?

J.H.: Because I was afraid that one of them might get mad and to the school, and I don't know what they would have done.

DETECTIVE OSMUNDSEN: So you were scared?  Okay. Do you know if Mr. Schirmer touched anybody else?

J.H.: He touched S I think.

DETECTIVE OSMUNDSEN: Why – why do you think that?

J.H.: Because [S.S.] was in here.

DETECTIVE OSMUNDSEN: Okay.  Has anybody ever touched you besides Mr. Schirmer?

J.H.: No.

[Docket No. 108, Ex. 16 at 39:14-45:24].  Osmundsen's last interview was with T.R.  [SUMF-DSO ¶ 112].  Ragusa does not recall seeing T.R.'s interview either.  [Ragusa Dep. at 23:1-4]. During the interview, the following exchanges occurred:

DETECTIVE OSMUNDSEN: Why are you here?

T.R.: Because the teacher, the aide, Mr. Schirmer, he's been making me feel kind of uncomfortable.

DETECTIVE OSMUNDSEN: Feeling a – a little uncomfortable.  Tell me how you feel uncomfortable.

T.R.: Well, he like – sometimes when we walk down to like – I'll help him out with stuff.  Like sometimes

15

when we're walking the hallway to go to his room,
he puts his arm around me and puts me up against
his side.

DETECTIVE OSMUNDSEN: Puts his arm around you and
puts him up against your side?

T.R.: His side.

DETECTIVE OSMUNDSEN: His side.  He just like puts
his arm around you and holds you, or does he pull
you in tight, or something else?

T.R.: He kind of like holds you kind of steady.

DETECTIVE OSMUNDSEN: Okay.  What's he say?

T.R.: Nothing.

DETECTIVE OSMUNDSEN: Nothing.

T.R.: Just walk.

DETECTIVE OSMUNDSEN: Did this happen once, more
than once, or something else?

T.R.: Well, the only times it happened was once
or twice.

                    *     *     *

DETECTIVE OSMUNDSEN: Okay. Okay.  Has anybody
ever touched you in your private part or places
that you don't want to be touched?

T.R.: Only a doctor.

DETECTIVE OSMUNDSEN: Only a doctor, okay.  All
right.  When Mr. Schirmer – you said Mr. Schirmer
put his arm around you?

T.R.: (Nods head.)

16

DETECTIVE OSMUNDSEN: Can you point where he touched you.

T.R.: Like right here.  His hand would be on this side.

DETECTIVE OSMUNDSEN: On your shoulder blades or somewheres else?

T.R.: Shoulder blades usually.

DETECTIVE OSMUNDSEN: Okay. Did he – did he reach around you, or did he just put his hand on your shoulder, or something else?

T.R.: He reached around me, then pulled me over so I was up against his side.

DETECTIVE OSMUNDSEN: Okay.  And how did that make you feel?

T.R.: Uncomfortable.

DETECTIVE OSMUNDSEN: Uncomfortable?

T.R.: Uh-huh.

DETECTIVE OSMUNDSEN: Did you tell anybody?

T.R.: Well, most of the kids that have been happening – we've been kind of been talking about it, and it's been getting up to this point.

[Docket No. 108, Ex. 18 at 4:7-5:16, 12:7-13:19].

Later that day, Penkethman gave a statement to Stocker, Holt and DeVico.  [SUMF-DSO ¶ 83].  In his statement, Penketham indicated that he believed that some of the students in Plaintiff's class, though none of the students involved in the

17

investigation, were angry with Plaintiff and might have wanted to get him "in trouble" or fired.  [SUMF-DSO ¶ 92].

G.   Charging Plaintiff

After the interviews of the above children and Penkethman, Stocker, Ragusa, Frame, and Holt met to discuss next steps. [SUMF-DSO ¶¶ 117-121].  Ragusa testified that she had concerns about the case, specifically the fact that the children had already been interviewed by the school officials, and that Frame saw Ragusa's "reluctance or hesitancy." [Ragusa Dep. at 34:22-36:13].  After speaking with Frame, however, Ragusa consented to charges being brought against Plaintiff based on his conduct with J.H and S.S.  [SUMF-DSO ¶¶ 125, 128; Ragusa Dep. at 36:10-21].  Ragusa testified that she did so because she believed there was probable cause for each charge.  [Ragusa Dep. at 43:12-23].

According to Stocker, Ragusa represented to him that the police had jurisdiction for charges based on the alleged incident with J.H., even though that incident allegedly took place in Philadelphia.  [SUMF-DSO ¶ 127].  Ragusa, however, denies this conversation occurred and maintains that she only learned that that episode occurred in Philadelphia after the charges had been made and that she would not have consented to

the charges if she had known because her Office lacked
jurisdiction over them.  [Ragusa Dep. at 71:24-72:8, 82:23-84:9,
124:18-157:7].

After receiving Ragusa's consent, Schirmer was charged in
two criminal complaints, signed by Stocker, charging him with
violations of N.J.S.A. 2C:14-2(B) (sexual assault, a crime in
the second degree) and 2C:24-4A (conduct impairing or debauching
the morals of the minor, a crime in the third degree), as to
both J.H. and S.S.  [SUMF-DSO ¶ 128; Exs. 22-23].  Plaintiff was
subsequently arrested pursuant to two separate arrest warrants.
[Id. at ¶ 129; Id. at Exs. 22-23].

H.   M.S. Allegations

The following day, Stocker was contacted by the father of
M.S., who raised similar concerns regarding Plaintiff's contact
with M.S. [Id. at ¶ 131].  Ragusa recommended that charges be
filed based on this conduct also and Plaintiff was charged with
violation of N.J.S.A. 2C:24-4A (endangering the welfare of a
child) based on his alleged conduct with M.S.  [Id. at ¶¶ 140-
141].

I.   Dismissal Of Charges Against Plaintiff

On March 4, 2009, the charges against Plaintiff regarding
J.H. were dismissed and the case was referred to the

19

Philadelphia District Attorney's Office because Ragusa believed
that she lacked jurisdiction to prosecute for conduct that
occurred in Philadelphia.  [SUMF-DSO ¶ 143-44; Ragusa Dep.
31:18-32:4].  The remaining charges against S.S. and M.S. were
downgraded to a violation of N.J.S.A. 2C:33-4B (harassment) and
later dismissed by the Municipal Court Judge based on his
finding that, while there was probable cause for Plaintiff's
arrest, the state could not establish Plaintiff's guilt beyond a
reasonable doubt for the newly downgraded crimes charges.
[SUMF-DSO ¶¶ 145-46; Docket No. 108 at Ex. 30].

    J.   This Action

    Plaintiff now asserts federal and New Jersey state
constitutional claims against each of the defendants pursuant to
42 U.S.C. § 1983 and the New Jersey Civil Rights Act.
Specifically, Plaintiff alleges: (1) false arrest and malicious
prosecution as to defendants DeVico, Stocker, Osmundsen, Holt
and Frame (the "Police Defendants") in violation of the federal
and state constitutions [Docket No. 80, Second Amended Complaint
("Compl.") Counts I, II, and IV]; and (2) that the actions of
Penkethman and Kopakowski(the "School Defendants") resulted in
the malicious prosecution of Plaintiff in violation of the

federal and state constitutions [Compl. Counts III and IV].  The
Defendants have all moved for summary judgment.

II.  Standard

Summary judgment shall be granted if "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  A fact is "material" if it will "affect the
outcome of the suit under the governing law . . . ."  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is
"genuine" if it could lead a "reasonable jury [to] return a
verdict for the nonmoving party."  Id. at 248.

When deciding the existence of a genuine dispute of
material fact, a court's role is not to weigh the evidence: all
reasonable "inferences, doubts, and issues of credibility should
be resolved against the moving party."  Meyer v. Riegel Products
Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, a mere
"scintilla of evidence," without more, will not give rise to a
genuine dispute for trial.  Anderson, 477 U.S. at 252.  In the
face of such evidence, summary judgment is still appropriate
"where the record . . . could not lead a rational trier of fact
to find for the non-moving party . . . ."  Matsushita Elec.
Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide.'" Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) (quoting Anderson, 477 U.S. at 265).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995). Initially, the moving party has the burden of

22

demonstrating the absence of a genuine issue of material fact.

Celotex Corp.

III. Analysis

The Court first addresses the claims against the Police Defendants.  It then addresses the claims against the School Defendants.

A.   Claims Against DeVico, Stocker, Osmundsen, Holt, and Frame

Plaintiff asserts claims of false arrest and malicious prosecution against the Police Defendants in violation of 42 U.S.C. § 1983 and the New Jersey Civil Rights Act.  The Court addresses each claim in turn.

1.   False Arrest

Plaintiff's false arrest claim is predicated on his March 19, 2008 arrest.  Under both federal and New Jersey law, a claim for false arrest requires that: (1) there was an arrest; and (2) that the arrest was made without probable cause.  Ferry v. Barry, No. 12-009, 2012 WL 4339454, at *5 (D.N.J. Sept. 19, 2012); Gil v. N.J., No. 12-701, 2012 WL 23570503, at *2 (D.N.J. June 19, 2012)(holding that, under New Jersey law, "[t]here are two elements required to bring [a false arrest claim]: (1) constraint of the person against his will (2) that is without legal justification."); Tarus v. Borough of Pine Hill, 189 N.J.

23

497, 521 (2007)(holding that probable cause is an absolute

defense to a claim of false arrest under New Jersey law).  If

probable cause exists as to "as to any offense that could be

charged under the circumstances," then the false arrest claim

fails.  Johnson v. Knorr, 477 F.3d 75, 85 (3d Cir.

2007)(emphasis added).

The standard for probable cause is identical under federal

and New Jersey law.  Maples v. City of Atlantic City, No. 06-

2200, 2008 WL 2446825, at *6 (D.N.J. June 16, 2008); New Jersey

v. Basil, 202 N.J. 570, 585-86 (N.J. 2010)(reciting standard for

probable cause to arrest under New Jersey law and citing to

federal law as the basis for that standard). In determining

whether probable cause existed at the time of the arrest, the

"arresting officer's state of mind" and the charges "actually

invoked by the arresting officer" are irrelevant.  Devenpeck v.

Alford, 543 U.S. 146, 153 (2004); Jaegly v. Couch, 459 F.3d 149,

154 (2d Cir. 2006).  Courts must instead objectively assess

whether, at the time of the arrest and based on the facts known

to the officer, probable cause existed "as to any offense that

could be charged under the circumstances."  Wright v. City of

Phila., 409 F.3d 595, 602 (3d Cir. 2005)(emphasis added); Barna

v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994).

"Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a reasonable person to believe an offense had been committed." United States v. McGlory, 968 F.2d 309, 342 (3d Cir. 1992). "The probable cause inquiry . . . does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate." Wright, 409 F.3d at 603.  "[O]nce a police officer has determined that probable cause exists, he has no duty to further investigate the complainant's accusation or interview other witnesses in an effort to find exculpatory evidence" absent "[known] plainly exculpatory evidence or circumstances indicating a witness's unreliability."  Harris v. Jacobs, No. 11-4685, 2012 WL 4109052, at *7 (E.D. Pa. Sep. 19, 2012); Merkle v. Upper Dublin School Dist., 211 F.3d 782, 790 n.8 (3d Cir. 2000)("Hahn was not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed.").

     The Police Defendants argue that they are entitled to summary judgment because there was probable cause for Plaintiff's arrest.  This Court agrees.  As discussed above, a finding of probable cause as to any charge is sufficient to

25

defeat a false arrest claim.  <u>Johnson</u>, 477 F.3d at 85.  And,
here, regardless of whether there were jurisdictional
infirmities with respect to the charges based on J.H.'s
allegations[2], Defendants had probable cause to arrest Plaintiff
based on S.S.' allegations.

---

[2]     Defendants argue that, in fact, under <u>N.J. v. Sumulikoski</u>, 2012 N.J.
Super. Unpub. Lexis. 1674 (N.J.Sup. July 9, 2012), there was
jurisdiction for the charges based on J.H.'s allegations.  While this
Court need not resolve this issue, it agrees that <u>Sumulikoski</u> provides
some support for this proposition with respect to the charges against
Plaintiff under NJ Stat. 2C:24-4A.  <u>Sumulikoski</u> held that New Jersey
had the power to prosecute conduct that occurred outside of New Jersey
where a material element of the offense occurred inside New Jersey.
<u>Sumulikoski</u>, 2012 N.J. Super. Unpub. Lexis 1674, at *17.  There, the
defendant was a teacher chaperoning a school event in Europe and the
Court held that New Jersey <u>potentially</u> had jurisdiction to prosecute
him for sexual assault (first degree) and endangering welfare of
children (second degree) because those charges had elements –
"supervisory or disciplinary power" over the alleged victim for the
former and "assumption of responsibility" over the alleged victim for
the latter – that could occur in New Jersey, which the State could
establish at trial.  <u>Id.</u>  Here, <u>Sumulikoski</u> would not provide a basis
for jurisdiction for the charge under N.J. Stat. 2C:14-2(b) because
that statute does not have any analogous element that could occur in
New Jersey. N.J. Stat. 2C:14-2(b)("An actor is guilty of sexual assault
if he commits an act of sexual contact with a victim who is less than
13 years old and the actor is at least four years older than the
victim.").  With respect to the charge under N.J. Stat 2C:24-4(a), it
is unclear whether those charges would support jurisdiction because
there is confusion as to what particular charge Plaintiff faced.  The
criminal complaint indicates that Plaintiff was being charged under the
statute for a violation in the third degree [Docket No. 108, Ex. 22],
which does not contain any element that could occur in New Jersey as in
<u>Sumulikoski</u>. N.J. Stat. 2C:24-4(a)("Any person having a legal duty for
the care of a child or who has assumed responsibility for the care of a
child who engages in sexual conduct which would impair or debauch the
morals of the child, or who causes the child harm that would make the
child an abused or neglected child as defined in R.S. 9:6-1, R.S. 9:6-3
and P.L. 1974, c. 119, § 1 (C. 9:6-8.21) is guilty of a crime of the
second degree. Any <u>other</u> person who engages in conduct or who causes
harm as described in this subsection to a child under the age of 16 is
guilty of a crime of the third degree.")(emphasis added).  However, the
complaint also indicates that Plaintiff had "a legal duty of care" for
J.H." [Docket No. 108, Ex. 22], which is an element of a charge under

Plaintiff does not dispute that S.S.' account during the interview with Osmundsen, if credited, would be sufficient to establish probable cause.  It would.  <u>See</u> N.J. Stat. 2C:24-4(a); N.J. Stat. 2C:14-2(b).  And, in fact, it was reasonable to credit S.S.' statement to Osmundsen, as:

    (1)  J.B. had indicated that S.S. had complained of inappropriate touching by Plaintiff;

    (2)  S.S. confirmed the complaint in multiple interviews that were generally consistent with one another; and

    (3)  J.H.'s account would tend to bolster S.S.' account, by showing lack of accident or mistake.

Plaintiff argues that, despite this evidence, there was no probable cause because: (1) S.S.' credibility is suspect based on the fact that S.S. gave somewhat different accounts to Penketham and Osmundsen of Plaintiff's conduct; (2) the Police Defendants were required, and failed to, conduct further investigation; and (3) there was significant information in the

---

the same statute in the second degree and would support jurisdiction under <u>Sumulikoski</u> for the charge.

27

school's possession that would cast doubt on J.H.'s credibility.[3]
This Court disagrees.  First, the differences in S.S.' accounts
were not significant enough to materially undercut S.S.'
credibility.  Second, the Police Defendants were not required to
continue investigating once they believed probable cause had
been established based on S.S.' allegations.[4]  On the record
before the Court, there was no <u>known</u> exculpatory material, or
witness reliability issues that would trigger such a duty.
Third, to the extent that other information now known casts

---

[3]    Plaintiff also heavily relies on <u>Robinson v. Jordan</u>, 804 F. Supp. 2d
203 (D.N.J. 2011) in opposing summary judgment.  In <u>Robinson</u>, there
were disputed issues of fact that, accepting Plaintiff's account, would
support a finding that the defendants lacked probable cause.  804 F.
Supp. 2d at 209.  In particular, there was evidence that the statement
of the complaining witness, which was the primary basis for probable
cause, may have been a product of coercive conditions.  <u>Id.</u> at 208.
<u>Robinson</u> is inapposite for two reasons.  First, here, unlike <u>Robinson</u>,
there are no material issues of fact in dispute as to the information
available to the Police Defendants when the arrest of Plaintiff was
made.  With no material issues of fact in dispute, the existence of
probable cause may be decided as a matter of law.  <u>Minatee v.
Philadelphia Police Dep't</u>, No. 11-3609, 2012 WL 5359527, at *2 (3d Cir.
Nov. 1, 2012)(holding, on motion for summary judgment, that "[b]ased on
the undisputed facts . . . probable cause existed for Minatee's
arrest."); <u>LeBlanc v. Stedman</u>, 483 F. App'x 666, at *3 (3d Cir.
2012)(concluding that probable cause existed as a matter of law);
<u>Sheedy v. City of Philadelphia</u>, 184 F. App'x 282, 284 (3d Cir.
2006)("It is undisputed Sheedy intentionally took marital, jointly
owned property. Therefore, as a matter of law, probable cause existed
to arrest Sheedy for theft.").  Second, in determining whether probable
cause existed on the undisputed facts, there is no evidence here that
S.S.' statement was given under unduly coercive or suggestive
conditions as in <u>Robinson</u>.

[4]    While Plaintiff submitted an expert report [Docket No. 122, Ex. J]
suggesting that the Police Defendants' investigation was deficient,
neither Plaintiff, nor Plaintiff's expert, point to the type of
specific known issues that would trigger a duty of further

doubt on J.H.'s credibility, the Police Defendants were not
required to correctly assess his credibility for there to be
probable cause.

In sum, it was reasonable to credit S.S.' statement to
Osmundsen and because that account, if credited, would supply
probable cause, Plaintiff's false arrest claim fails.

2.    Malicious Prosecution Claim

Plaintiff also claims that the Defendants are liable for
malicious prosecution based on their maintenance of the charges
related to J.H. and S.S.  Under both federal and New Jersey law,
to prevail on a malicious prosecution claim, a plaintiff must
show that a criminal proceeding was initiated without probable
cause. McKenna v. City of Philadelphia, 582 F.3d 447, 461 (3d
Cir. 2009)(reciting federal law); Stolinski v. Pennypacker, 772
F. Supp. 2d 626, 640 (D.N.J. 2011)(reciting New Jersey law).

Unlike in the false arrest context, a finding of probable
cause with respect to one charge does not in all cases insulate
law enforcement officers from malicious prosecution liability
for other charges.  Johnson, 477 F.3d at 83-84.  Rather, where
the defendant officers tack on an additional illegitimate charge
carrying a higher penalty or greater reputational damage, and do

---

investigation.

so by directly misleading the prosecutor, it may be appropriate to analyze the charges separately for probable cause. Stolinski, 772 F. Supp. 2d at 640.  "Conversely, when the count lacking probable cause is closely related to the other counts, and does not carry a substantially greater penalty or cause greater reputational damage, or where the defendant is less directly involved in bringing the particular count in question, there is less reason to adopt the count-by-count approach."  Id.

Here, the circumstances warrant the non-count-by-count approach.  Id. (finding the same); Griffin v. Walbert, No. 11-cv-924, 2012 WL 123560, at *5 (M.D. Pa. Jan. 17, 2012)(same). Even if the J.H. charges had a jurisdictional defect, they did not impose significant additional reputational consequences and criminal penalties on Plaintiff, since the charges were identical to those based on S.S.' allegations.  Neither was there any evidence that any Defendant actively misled Ragusa. While it is disputed whether Ragusa knew that the J.H. episode occurred in Philadelphia, in either case there is no evidence that she was misled.  If she was informed of that fact, as claimed by the Defendants, then she was not misled.  If she was not informed, as claimed by Ragusa, there does not appear to be have been any deliberate effort to withhold this information

30

from her, given that she could have easily attended J.H.'s interview, or watched the video before consenting to the charges.

Applying this approach, Plaintiff's malicious prosecution claim fails because this Court already concluded above that there was probable cause for the charges based on S.S.' allegations.

B.  <u>Defendants Penkethman and Kopakowski</u>

While the nature of Plaintiff's claims against Penketham and Kopakowski are somewhat murky, to the extent Plaintiff asserts that the School Defendants caused the "malicious prosecution" of Plaintiff, the claim fails.  Defendants argue, and this Court agrees, that this claim fails for at least two reasons.

First, the School Defendants did not initiate the criminal proceeding against Plaintiff.  Under both federal and New Jersey law, malicious prosecution claims require that the defendant at issue be one who initiated the criminal proceeding.  <u>McKenna</u>, 582 F.3d at 461 (reciting federal law); <u>Stolinski</u>, 772 F. Supp. 2d at 636-37 (reciting New Jersey law).  While the Third Circuit has held that school official defendants <u>can</u> be found to have initiated a criminal proceeding, it was in the unique context

31

where: (1) the officials requested that charges be brought against the plaintiff; (2) the officials knew that the plaintiff had not committed a crime and withheld this information from the police; (3) the police department would not pursue the charges without the official's approval; and (4) the police department questioned the school official whether he still wished to pursue the charges before the preliminary hearing and he did. Merkle, 211 F.3d at 791, 794, 796 ("The action of the School District in initiating the criminal proceedings and pressing unfounded criminal charges against Merkle can render the District liable for its major role in a malicious prosecution. . . . Here, however, the employer never had cause to find a criminal violation, because it knew that Merkle acted without criminal intent.")(emphasis added). This Court declines to expand the scope of malicious prosecution liability beyond this type of highly specific situation because doing so would open the door to liability for almost any police referral, even where the referrer has no role in the charging decision and had supplied accurate information. And, here, there is no evidence that the School Defendants supplied any misleading

32

information or had any role in the decision to prosecute
besides referring the matter to the police for
investigation and supplying information upon request.  In
fact, Penketham disclosed to the police investigators facts
that would cut against bringing charges against Plaintiff.
Under these circumstances, the School Defendants cannot be
said to have "initiated" the proceeding and Plaintiff's
malicious prosecution claim against them fails.  L v.
Boyertown Area School District, No. 08-5194, 2009 WL
466386, at *4-5 (E.D. Pa. Feb. 24, 2009)(finding that
school principal did not initiate criminal proceeding where
there was no evidence principal had supplied misinformation
or encouraged prosecution in a misleading manner).

Second, even if the School Defendants had initiated
the criminal proceeding, Plaintiff's claim would still fail
on an additional basis – the existence of probable cause.
While the existence of probable cause for a malicious
prosecution claim against these Defendants must be
evaluated independently from the existence of probable
cause with respect to the Police Defendants (Merkle, 211
F.3d at 794-95), Penketham and Kopakowski had probable
cause to refer the matter to the police department for

33

further investigation based on Penketham's interviews of the school children.

To the extent that Plaintiff's claim is that such actions constituted a federal substantive due process violation, such claim is without merit.  Only the most egregious conduct that shocks the conscience is sufficient for such a claim and the School Defendants actions do not, in any way, shock the conscience.  See Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999)(holding that substantive due process liability exists only for "the most egregious official conduct" that is "so ill-conceived or malicious that it shocks the conscience.")(quotations omitted).  To the extent this claim is one for substantive due process under the New Jersey State Constitution, Plaintiffs were required, and failed, to identify a liberty interest that was violated.  See Lewis v. Harris, 908 A.2d 196, 207 (N.J. 2006)(requiring that a fundamental liberty interest be clearly identified to succeed on a substantive due process claim under the New Jersey State Constitution).

IV.  Conclusion

For all these reasons, Defendants' motions for summary judgment are GRANTED.

34

s/Renée Marie Bumb
RENÉE MARIE BUMB
United States District Judge

Dated:    December 31, 2012